John Beisiegel, Respondent, v. The New York Central Railroad Company, Appellants.

The common law does not impose upon railroad companies, while operating their trains with due care upon their railroad track, the duty of warning, by signals or means other than those prescribed by positive statute, persons crossing such track that they are so managing their business.

Nor does it require a railroad company to station a flagman at every street or road crossing, where a jury may be of the opinion that the travel is so great that ordinary prudence requires such precaution, *for the purpose of keeping travelers off such crossing,* when trains are passing over it.

And this, although an omission to station a flagman at a crossing where the railroad company run their trains at a greater rate of speed, or in other respects differently from what would otherwise be permissible or consistent with proper care, may be evidence of negligence to go to a jury.

Accordingly where, on the trial of an action by a foot passenger against a railroad company for injuries received from a passing train, while attempting to cross the track in a city street, the judge charged the jury that it was a question for them to determine, whether the crossing in question was in so populous a portion of the city, that it was due to the public safety and common prudence, that the company should keep a flagman stationed at that point, and if they determined that it was, then an omission to do so was negligence. *Held* (Hunt, Ch. J., and Mason, J., *dissenting*), that this was error, and a new trial was granted.

In an action to recover for personal injuries, evidence of the amount the plaintiff is earning at his trade, at the time of and immediately preceding the accident, is admissible upon the question of damages.

(This action was argued, a re-argument having been ordered in 1868 by the Court, on the 14th day of January, 1869, and decided on the 18th day of March, 1869.)

This was an appeal from a judgment ordered by the General Term of the Supreme Court in the seventh judicial district, upon a verdict for $10,000 in favor of the plaintiff, against the defendant, for injuries sustained by him from alleged negligence. The facts of the case are sufficiently stated in the following opinion of Grover and James, J. J.

*Edward Harris,* for appellants.

*Geo. F. Danforth,* for respondent, cited, upon the question

of the plaintiff's negligence in not looking, *Ernst* v. *Hudson River Railroad Company* (1 Keyes, 36, 37); *Beisiegel* v. *New York Central Railroad Company* (34 N. Y., 625). Upon the obligation of the defendant to keep a flagman at crossings, he cited *Brown* v. *New York Central Railroad Company* (34 N. Y., 404); *Bradley* v. *Boston and Maine Railroad* (2 Cush., 540); *Bowen* v. *New York Central Railroad Company* (18 N. Y., 408); *Kelsey* v. *Barney* (12 N. Y., 408); *Johnson* v. *Hudson River Railroad Company* (6 Duer, 633); *Kinney* v. *Crocker*, Receiver, (18 Wisconsin, 74); *Cook* v. *New York Central Railroad* (3 Transcript Appeals, 8); *Crittenden* v. *Wilson* (5 Cow., 165); *Presbyterian Church* v. *Mayor, &c., of New York* (5 Cow., 538); *Stuyvesant* v. *Mayor, &c., of New York* (7 Cow., 588, 604–609); *Lawrence* v. *Great Northern Railway* (16 A.d. & Ell., N. S., 643); *Moshier* v. *U., and S. Railroad* (8 Barb., 427); *Baptist Church* v. *U. and S. Railroad* (6 Barb., 313); *Ernst* v. *Hudson River Railroad* (36 How., 90); *Brand* v. *Troy and Schenectady Railroad* (8 Barb., 368, 379, 382); *The Mayor* v. *Bailey* (2 Denio, 433); *Fero* v. *Buff. and State Line Railroad* (22 N. Y., 209).

GROVER, J. The plaintiff was entitled to recover (if at all) for the time lost in consequence of the injury received, and to show what it would have been worth to him. What he was earning at his trade at the time of and immediately preceding the injury tended to show the value of his labor, and was therefore proper for the consideration of the jury in determining the value of the plaintiff's time lost by the injury.

The motion for a nonsuit was based upon the grounds, First, that there was no evidence of negligence of the defendant or its servants. Second, that the evidence showed that the plaintiff was negligent, and that such negligence contributed to the injury. The plaintiff's evidence tended to show an omission to ring the bell or to sound the whistle upon the engine that struck the plaintiff, as it approached and arrived at the crossing. This evidence was a sufficient answer to

the first ground. The second ground presents a more difficult question. The plaintiff was crossing the track on foot; and it would seem that the exercise of proper care on his part to protect himself would have enabled him to keep out of the way of the engine. For this purpose it was his duty to be vigilant, irrespective of whether a bell was ringing or whistle sounding, to use his ears in listening and his eyes in looking, to enable him to avoid danger. (*Ernst* v. *The Hudson River Railroad*, December term, 1868, of this court.) It is necessary to examine the evidence, to see whether it established any omission of the above duty by the plaintiff. The proof showed that, at the crossing in question, the defendant had five tracks. That upon two of the tracks upon the side upon which the plaintiff approached the crossing, and in close proximity thereto, empty box cars were standing, that prevented a view along the third track towards the east beyond a distance of ten feet, until after passing the box cars standing on the second track. That, as the plaintiff approached the crossing, a train of freight cars passed to the east with the bell ringing. That the plaintiff waited until this train had passed, and stepped forward to cross, hearing nothing approaching from the east. That, as he stepped upon the third track, he looked west along the track, and seeing nothing approaching, immediately looked east, and at that instant was struck by the engine. The plaintiff used his eyes as far as he could; and such use would undoubtedly have protected him, had not his view to the east been obstructed by the box cars standing upon the track, until he had gone so far that he could not extricate himself from the danger. The noise of the freight train may have prevented his hearing the approaching engine; and if he heard it, he undoubtedly thought the noise caused by the freight train. The negligence of the plaintiff was not so conclusively established as to justify the judge in withholding the question from the jury. There was, therefore, no error in the denial of the nonsuit. The judge was right in refusing to charge, that, if they found that the bell upon the engine was ringing, as required by statute, there was no

proof of defendant's negligence. This ignored the question whether it was negligence to have the box cars standing where they were. This depended upon the inquiry, whether they were necessarily left there in the prosecution of the business of the defendant. As the law imposed upon the plaintiff, for his protection, the duty of looking along the track, an unnecessary obstruction to the view by the company constitutes negligence. The judge submitted to the jury the question whether the bell was rung, with the proper instructions; as also the question arising from the position of the box cars upon the track. The judge further charged the jury, after stating to them that the defendant was bound to keep a flagman at the State street crossing, and were not bound to keep one at road crossings in the country · where there was but little travel, that the question was whether St. Joseph street (the crossing in question) was such a populous portion of the city, that it was due to the public safety, and in common prudence, in view of the high powers exercised by the company, passing with the high speed at which they run their trains, that they should keep a flagman at that point. That, if they thought it was an omission of a precaution which, in ordinary prudence and care, the company was called upon to practice, then it was negligence to omit that duty. To this portion of the charge the defendant excepted. The counsel for the defendant requested the court to charge the jury that the defendant was not bound to keep a flagman at that crossing. The court refused, and the defendant excepted. It thus appears, that the jury were instructed that they were at liberty to find the defendant guilty of negligence solely on the ground of an omission to keep a flagman at the crossing, if they were of opinion that ordinary prudence required one there, although finding that in every other respect the defendant had performed its duty; as all the other grounds upon which negligence was imputed were controverted questions of fact. The question is thus fairly presented, whether a railroad company is required by law to station a flagman at every street or road crossing where, in

the opinion of a jury, the travel is such that ordinary prudence requires it, for the purpose of warning and keeping travelers off from such crossings when trains are passing over them. This is an original question in this court, and must be determined upon principle and the analogies of the law. It has been remarked in the opinions, in some cases, that railroad companies are bound to use all possible care to prevent injury to travelers at crossings. If this be so, it is manifest that such injuries may be entirely prevented; as means might be adopted, such as would entirely prevent any person being upon the crossings, or within the reach of trains when passing. These remarks were not essential to the cases adjudicated. No case has been determined by the court upon any such principle. Railroads are authorized by statute to construct their road, and run their trains across streets and highways. The same statute provides that they shall give certain signals for the purpose of warning travelers of their approach and presence; such signals being, in the judgment of the legislature, sufficient to protect the public from injury in the use of the crossings. Keeping a flagman at the crossings, or any of them, is not required by statute; nor does the statute require the company to give warning to travelers otherwise than as therein provided. The question is, whether the common law requires the company to warn travelers of approaching trains by other and more effective means than those the statute requires. The claim that it does is based upon the maxim, that every one must so use his own as not to injure another. In applying the maxim to the present case, it must be borne in mind, that the traveler and railroad have each an equal right of way in the crossings, derived from the same authority. The former for the purpose of travel, and the latter for running its trains. A collision is somewhat dangerous to the trains, but vastly more so to the traveler. The law imposes upon both the duty of observing care to avoid them. But the care imposed upon the company is in operating its trains; in so transacting its business, in the exercise of its right of way, as not to injure others in the

exercise of their similar right, provided the latter exercise due care on their part. This relates to the mode of operating the trains, and all other things done by the company in the transaction of its business. It does not require the company to employ men to keep travelers off the track, or to serve notices upon them that trains were approaching. Should the company do this, it would relieve the traveler from all necessity of exercising care in this respect; and it would, indeed, be safe for him to go upon the track, having received no express warning. If the exertions of the flagmen were, in any particular case, inadequate to prevent injury to a traveler, upon the same principle, it might be submitted to a jury whether ordinary prudence did not require gates to be closed at certain crossings, while trains were passing, or something else done to protect the traveler; and if, in their judgment, it did, to instruct them that such omission was negligence. If the charge in the present case is sustained, I can see no limit to what is required of the company to exonerate it, upon the ground that it has been free from negligence, except it has done everything, outside of the transaction of its business, that, in the opinion of a jury, prudence required. Such is not the true application of the maxim. As above remarked, it requires such care in conducting the business of the company as will prevent injury to others in the exercise of their rights, if proper care is observed by them; but it requires nothing to be done by the company outside of such business, to give warning to travelers outside of the track. The obligation upon the company to do the latter is imposed by statute; and all that can be required of the company, in this respect, is a strict observance of the statute. It is true, that the company may employ men to keep travelers off from the crossings when trains are passing; and if they do this, it will be safe for them to run at greater speed, or in other respects different from what would be otherwise permissible; but this is a matter to be determined by the company, and cannot be imposed as a legal duty, except by the legislature. *Brown* v.

*The Central* R. R. Co. (34 N. Y., 404), is cited in support of the principle contained in the charge. But that was an action by a passenger to recover for an injury received while such; and the opinion, when read in connection with the facts, gives no support to the rule contended for in the present case. *Bradley* v. *The Boston, &c., Railroad* (3 Cushing, 539), is not in conflict with the views above expressed, but, so far as applicable, accords therewith. The principle upon which *Johnson* v. *The Hudson River Railroad* was decided, is the same as that in the case last referred to. Both related to duties to be performed upon the train or car. *Kinney* v. *Crocker* (18 Wisconsin, 74), sustains the ruling of the judge in the present case, but I cannot concur in the reasoning of the court. That reasoning would lead to results, I think, not contemplated by the court, unless the usage referred to was of a character to become obligatory, as, such, upon the road in that state; and if so, the case is not applicable in this. There is no such usage of keeping flagmen at crossings by railroads in this State, as to render it obligatory upon that ground. I have examined the other cases referred to by counsel, and fail to find the principle of the charge supported by authority. There is nothing in the point made upon the fact, that a flagman had been some time before the injury kept at the crossing in question. None was kept there at the time, and the plaintiff was aware of that fact. Besides no question arising from any such fact was submitted to the jury. The judgment should be reversed and a new trial ordered, costs to abide event.

JAMES, J. I think the plaintiff in this case should have been nonsuited, on the ground that his own carelessness and negligence contributed to the injury; and such nonsuit would not have been in conflict with the ruling of this court in setting the former nonsuit aside. On the first appeal, the nonsuit was set aside on the ground, as Justice MORGAN said, " that, as appeared from the plaintiff's statement, we must assume that the defendants ran their engine at a dangerous rate of

speed, without giving any signal of danger;" and as Porter, Judge, said, "the nonsuit seems to have been granted on the theory that a citizen who crosses a railway track, at its intersection of a public highway, is an absolute insurer of his own safety against the *criminal negligence* of a wrong doer;" that "there was no signal from any quarter of any danger. The flagman, whose duty it was to be at his post and display his flag, when an engine was drawing near, did not appear to give the customary warning." Upon such facts the former decision may stand unquestioned.

An entirely different case is now presented, removing the important elements upon which the former decision was based.

It was shown that no flagman had been kept at the crossing for more than a year previous to the accident, and that such fact was well known to the plaintiff; that for six years prior to the accident, the plaintiff had resided on the street about two miles distant from the crossing, and during that period had crossed the railroad track on this street frequently, some days, several times each day; that he had crossed the track at that place about an hour before the accident; saw the cars standing on the side track; knew that engines and cars were often passing both ways, and was perfectly familiar with the location of the track and streets. The proof did not establish that the engine which did the injury, "was running at a dangerous rate of speed," or running "without giving signals of danger," or that defendants were guilty of "criminal negligence." The plaintiff's evidence as to speed was as follows: One witness said "it was running *as fast as it could go;*" another, "that the engine was backing down *very quick;*" another, "it went *considerable fast*—it passed *fast down;*" another, "the engine *run fast;*" another, "it was going *pretty fast.*" All these witnesses were indefinite; they testified in the comparative. What was meant by the terms, "*as fast as it could go;*" "*very quick;*" "*considerable fast;*" "*pretty fast;*" "*fast?*" Who can tell? Did all mean the same speed, or did each mean a different degree, more or less?

Opinion of the Court, per JAMES, J.

One witness, a female, said, "it was running *as fast as it could go.*" How fast that was did not appear; but common knowledge, outside the case, would probably put it at sixty miles an hour. Yet the whole evidence negatives such a con struction. How fast then did the engine move? The court was not authorized to say, on this evidence, that it was run at "*a dangerous rate of speed,*" or with "*criminal negligence;*" clearly not, taken in connection with the defendants' evidence. The engineer and the fireman, who had their attention called to the fact, say the speed of the engine was from four to six miles an hour, not to exceed six; that they judged from practice and experience, and that experienced men could tell, within one or two miles per hour, of the speed of an engine; and another witness, who met the engine after it had passed this crossing, on to a down grade, said it was then going only at the rate of seven or eight miles per hour. One of plain tiff's own witnesses, Stull, shows that, when the rear of the freight train passed, the engine was within fifteen to eigh teen feet of the crossing; from where the plaintiff stood to where he was struck was half that distance. Six miles per hour is over eight feet per second.

The plaintiff himself said of the accident: "I was struck on the shoulder and pushed around, and then on my leg; I got a push on the left shoulder, and got a push the other way again, and was then thrown down; the whole was done while I could count one, two, three." On his cross-examination, he testified: "When I was first struck it was a push on the shoulder, at the same time I felt twitched on the right leg, that turned me partly around; I was pushing against the car, and then I was thrown in the middle of the street; there was a little black and blue spot on my shoulder; where the engine struck my left shoulder I felt a little hurt; when the engine struck my shoulder I pushed against the tender by my body; that was then about the middle of the street."

This evidence is conclusive that the engine, when it struck plaintiff, was moving slowly. It entirely overcomes the indefi nite statements of plaintiff's witnesses, and demonstrates the

unreliability of conclusions and opinions formed during moments of excitement. The defendants' engineer, who had had some experience, testified: "That the effect of a blow from an engine upon the shoulders of a person, at the rate of speed he was running, would be to push the person over, or to turn him around; at a more rapid rate, it would knock him as a bat would a ball; knock him clear." The general knowledge of mankind sustains this view. Had the engine been moving faster than from four to six miles an hour, when it struck the plaintiff on the shoulder, it would have caused something more than "a little *black and blue* spot." As a whole, the evidence was conclusive, that when the engine struck the plaintiff, it was moving slowly; not over four or six miles per hour; "*not at a dangerous rate of speed.*" So that one of the grounds on which the former nonsuit was set aside (34 N. Y., 622), is not now in the case.

The plaintiff's proofs as to "*giving signals,*" and as to "*criminal negligence,*" which means the same thing, is as follows: The plaintiff himself says he "did not hear the bell ring, except on the long train." "I heard the bell ring on the long train." This establishes the fact that a bell was ringing at the time of the accident. Burkit testified "that there was no bell ringing on the engine; that it did not ring; if it had, he would have heard it." He "heard the bell ringing on the long train as it passed;" he "did not hear a bell at the time of the accident." He did not see the engine until after the accident, and whether its bell was rung after that was of no consequence. Stull said, "I saw the bell (engine); it did not ring; I did not hear it ring; after the engine passed this crossing, it was ringing; it commenced at next street west." The testimony of this witness is confused, but it is quite clear that he only meant to testify that he did not hear the bell of the engine ring, and did not see it after it had passed the crossing, because he testified when the long train was passing east, he could not see the engine on the north track; could see the upper part; and the proof is clear

that the rear of the long train passed the engine within fifteen to eighteen feet of the crossing.

Mary Meyer, however, is a more positive witness. She says: "I saw plaintiff coming up the street; a long train went past; I then saw plaintiff again for a minute; then I saw him lying on the track; I saw the engine which run over him; it was running as fast as it could run; *the bell was not ringing;* I saw it; *I watched the bell to see if it rung afterwards;* at next street it commenced ringing." This evidence does not assert that the bell was not ringing before the engine got to the crossing. Sink testified: "The bell on the engine did not ring; I did not see the bell operate; engine went about twenty steps after the injury, and then commenced to ring." Here is a flat contradiction between this witness and Mary Meyer. She says the bell did not commence ringing until it got to the next crossing. She watched to see. But the evidence of this witness, Sink, is of no importance otherwise, as he says he first saw the engine at the same moment plaintiff cried out, and does not state any thing that took place before.

Frank Stull says he jumped on to the rear of the long train as it passed the crossing, and the engine passed him fifteen or eighteen feet east of said crossing; did not hear the bell ring. The engineer and fireman both testify that four streets east of the crossing where the accident happened, the bell of the engine commenced ringing, and was rung all the way, and every moment continuously; that the fireman rung the bell, the engineer stood beside him with his hand on the throttle valve, both looking west; that neither saw the plaintiff or had any knowledge of the accident until afterwards, and their attention was then called to the subject of ringing the bell and keeping watch, and they distinctly recollect to what they testified. This was affirmative, positive evidence; if untrue, it was willful and corrupt perjury. It was unlike plaintiff's evidence; perjury could not be sustained against any one of his witnesses, if it was established to a certainty that the engine bell was ringing at and before the accident. These two

men were unimpeached, their character for truth unquestioned; they stood without contradiction by positive proof. Such evidence should not be disregarded, nor the character of such witnesses permitted to be defamed by the verdict of a jury upon such evidence as plaintiff produced in this case.

This evidence affirmatively proved that the "signals of danger were given;" that "defendants were not guilty of criminal negligence," and distinguishes the case from what it was, when formerly before this court. It removes from the case those elements, but for which, the previous nonsuit would have been sustained. We can therefore examine the question of plaintiff's negligence unembarrassed by the previous decision.

On the former occasion Justice MORGAN said: "Upon the undisputed facts of the case, the plaintiff could have avoided the accident by exercising a little more precaution before he stepped on to the third track. If the freight cars had not intercepted his vision, he must have seen the engine approaching from the east in time to have avoided the collision. It is said that common prudence required him to put himself in a position to see whether there was a train coming from the east, on the third track, before he attempted to cross it."

Of the correctness of this position there can be no question. A person walking can easily control his movements, and by ordinary attention avoid collision with other bodies; and hence in crossing highways, or railroad tracks, is required to give way to avoid teams, engines, or any more ponderous bodies, moving with greater speed, and not capable of such absolute and easy control.

The case of *Stubley* v. *Lond. and N. W. R. R. Co.*[*] (Exchequer, N. Y. Trans., Sept. 11, 1867),was very similar in its facts to this. Defendants' track crossed a much traveled foot way; on each side was a swing gate some distance from the rails; at the west gate, owing to the pier of a bridge, a person could not see a coming train for over thirty yards south, but by going within the line, and within about nine feet of the track, he could see 300 yards each way. The deceased

*(Law.Rep. 1 Exch. 13.)

came from the west, to cross, and was detained by a freight train passing south. As soon as it had passed, she proceeded to cross behind the train, and just as she reached the east track, was struck down by an express train from the south, which she had not observed. A motion for a nonsuit was denied.

A rule to show cause why a nonsuit should not be entered having been obtained, the court were unanimous that the rule should be made absolute.

POLLOCK, C. B., said: "I can see no negligence on the part of defendants. The railway is straight for hundreds of yards on either side of the place. The track is of itself a warning of danger to those about to go upon it, and cautions them to see whether a train is coming. There was no evidence to go to the jury."

BRAMWELL, B., said: "I am very clearly of the same opinion. It is said, if a person stands at the west gate he cannot see the train until it is within thirty yards of him; but at that point he does not put his foot on the line, but has got to go a good deal further to reach the level, and when on the level with the line he could see 300 yards in each direction. In cross-ing the rails this woman was, as people often do, heedlessly going on at the rear end of a passing train without waiting to see whether the other track is clear." "Passengers crossing the rails *are bound to exercise ordinary and reasonable care for their own safety*, and to look this way and that way to see if danger is to be apprehended. And this ordinary care would be sufficient to prevent most accidents, and would have prevented this; but deceased forgot to take account of the possibility of the opposite track being occupied by another train, which had been hidden from view by the passing freight train."

PIGOTT, B., said: "I am of the same opinion. I cannot help saying that the deceased stepped into danger in a thoughtless way, and put herself in peril, and took the chance of what might be coming on the other track.

"(I do not say that in no case ought railway companies to station watchmen at public crossings, but such cases must be

exceptions; and there would be no limit to their liability if it were left loosely to jurors in every case to say whether any further precautions ought to have been taken.")

In this case the plaintiff, at rest behind the standing cars on the first and second tracks, was concealed from the view of those having charge of the engine approaching from the east. Suddenly he steps out, and is struck ere he crosses the next track; as he says, "on taking a third step." The engine, therefore, must have been within fifteen feet of the street, when he took his first step. It is singular that he did not hear its approach; but more singular that he first looked east, against the end of the car, where he could not see over ten feet, and then west, and continued looking west, where the track was clear for a long distance, until struck. The most casual look east, after he passed the south line of the standing cars, would have shown his danger, and afforded him ample time to avoid it.

The plaintiff knew that trains were often passing at this crossing. It was his duty, therefore, before starting, to cross the track from his place of concealment, to have ascertained whether an approaching train or engine was coming, and within fifteen feet of the place where he stood; one step in advance, which would have been perfectly safe, and a look east, would have shown him the danger; and his omission of this easy, simple precaution, demanded of all persons before entering upon a railroad crossing, was gross negligence, contributing to the injury, and bars all right of action against the defendant, even though its agents or servants were also negligent.

In the language of Justice MILLER in *Wilcox* v. *Rome, Watertown and Ogdensburgh Railroad Company* (39 N. Y. R., 358), decided in this court last June, "a traveler, in crossing a railroad track, is bound to exercise at least ordinary sense, prudence and capacity; and this requires he should use his eyes and ears, so far as he has opportunity. None of the cases adjudicated exonerate him from thus employing his faculties; those relied upon, as sustaining a contrary doctrine, are exceptional." In that case, the intestate

was killed on the track in a highway. It was claimed that no bell was rung or whistle sounded, and that the deceased was not negligent in not hearing the train, as it came round a curve near the crossing; that the evidence as to whether those signals were given, was conflicting, and the court assumed they were not given, and thus the question was distinctly presented, whether that omission relieved the deceased from the charge of negligence, which contributed to produce the result; and this court held it did not, and that the court below should have nonsuited the plaintiff.

The learned judge, in his opinion, cited and reviewed the authorities in this State bearing upon the question, and thus concluded: "The effect of the cases cited is to sustain the principle, that where the negligence of the party injured or killed contributed to produce the result, he cannot recover; and that the omission of the company to ring the bell, or sound the whistle, near the crossing of a highway, does not relieve the person who is about to pass over the highway from the obligation of employing his senses of hearing and seeing, to ascertain whether a train is approaching." The only difference in the facts between that case and the one now under consideration, material on this point, is, that in one, if the deceased had looked at all, he would have seen the approaching train; in the other, he had to advance but one step, and he could have seen the approaching engine. In principle there is no difference. As this case now stands, the judgment cannot be retained without overruling the sound and salutary rule laid down in the case of *Wilcox* v. *The Rome, Watertown and Ogdensburgh Railroad Co.* and the last decision of this court, in *Ernst* v. *Hudson R. R. Co.* (36 How., 84).

It is true, the court held in the latter case, that "when the question, whether the traveler used ordinary care and prudence in a given case becomes so complicated, and involves so many details that honest and intelligent men, acting without bias or partiality, in a single and sincere desire to determine according to the truth, may reasonably differ in their

conclusions, then the question should be left to the jury."
But here the facts are not complicated, nor involved in
details; there are no reasonable grounds upon which honest
men should differ. The plaintiff knew he could not see an
approaching train from the east; he knew one step forward
would place him where he could see, and that step, and that
look, he should have taken before rushing forward on to the
track.

In submitting the question of defendants' negligence to the
jury, the court said: " The question is, whether St. Joseph
street is such a populous portion of the city, that it is due to
public safety and common prudence, in view of the high
powers exercised by the railroad company, passing with the
high speed at which they run their trains, that they should
keep a flagman at that point. If you think it was an omis-
sion of a precaution, which, in ordinary prudence and care, the
company was called upon to practice, then it was negligence
to omit that duty."

To this there was an exception.

As given to the jury, this charge presents the question
whether a railroad is bound to keep a flagman at such street
and highway crossings, as a jury, from the amount of travel,
may think the public safety requires, in addition to the sig-
nals and cautions imposed by statute. It is a question of the
highest importance to the public, and to railway companies.

Railroad companies receive their charters, with their fran-
chises, from the legislature. Of the power of the legisla-
ture to grant them, there is no question. They are authorized
to cross streets and highways with their tracks, and operate
their trains thereon with steam or other motive power. The
danger from moving trains to travelers at crossings, where
the street or highway is on a level with the railroad track,
was well known to the legislature; and, as a measure of pub-
lic safety, it imposed upon such corporations the duty of
putting up notices at all crossings, and of giving signals upon
all moving trains and engines approaching crossings. These
obligations are to be observed. All omissions are at the peril

of the company; but the duty of keeping a flagman, stationed at any particular crossing, is not a duty imposed either by statute or by the common law.

The common law imposes upon railroad corporations, when running their engines or trains over crossings, the exercise of reasonable care and diligence, to prevent injury therefrom to travelers on the road. The observance and performance of all the duties and obligations imposed by statute may not alone be sufficient. Cases may arise, where the corporation will not be exonerated from liability, by a mere compliance with these statutory requirements. These requirements are merely cumulative, and companies are bound to use such other reasonable care and precautions as the circumstances of each case may require. And this question of reasonable precaution is always a question for the jury; and the fitness of any particular expediency suggested, must depend upon the particular circumstances and exigency of each particular case. (*Bradley* v. *The Boston and Maine Railroad*, 2 Cushing, 539; *Linfield* v. *Old Colony Railroad*, 10 Cushing, 562; *Bilbee* v. *Railroad Co.*, 114 Eng. Com. Law, 583.) In the latter case, this question was distinctly presented. The plaintiff had a verdict, and the court, on its affirmance, said: " Without imposing on railroad companies larger burdens than the legislature intended they should bear, or laying it down as a rule, that they were bound to place guards (flagmen), &c., it placed its decision on the express ground, that the circumstances of the particular case should have induced in the company the exercise of more vigilance than was imposed by statute, and therefore it was properly left to the jury to say, whether the company had been guilty of negligence." This I hold to be the true rule.

In this case, the charge was erroneous in this. Instead of submitting to the jury the question whether, from the facts and circumstances of the case, the defendant had failed to exercise ordinary prudence and reasonable care, amounting to negligence, they were instructed in substance, that the question was, whether St. Joseph street was such a populous por-

tion of the city, " that it was due to the public safety, that the company should keep a flagman at that point; and if the jury thought it was, then it was negligence to omit that duty." This was calculated to withdraw the attention of the jury from the real question (the negligence of the defendant in respect to the particular transaction, under all the facts and circumstances attending it), and placing it upon a particular act, and the duty of the company to do that particular act. Whether there is negligence, depends upon the degree of care required and given in each particular case, irrespective of any particular mode. Whether the care was by a flagman, by gates, or by any other equivalent mode, is of no importance. If it were established as law, that the omission of any particular act—which, from the amount of travel at crossings, a jury might think required by the public safety—was negligence, a railroad company would never know when it was safe from that imputation. For, no matter how carefully it observed the requirements of the statute, or conducted itself in other respects, if it omitted any one act, which the caprice, or sympathy, or prejudice of a jury might think required for the public safety, the omission would constitute negligence, and subject it to all the consequences. For these reasons, and in this particular, I think the charge erroneous.

As to the other exceptions to the refusal of the judge to charge, I concur with the opinion of Judge GROVER.

The judgment should be reversed, and a new trial granted, costs to abide the event.*

MASON, J. (dissenting.) There is some apparent conflict in the opinion of judges, as to the degree of negligence, which will subject a railroad company to liability, in case of injury to the wayfarer, at a highway or street crossing.

* The English authority cited in the foregoing opinion, Stubley v. London and North West. Railway, is reported, Law Rep., 1, Exch. 13. It is misprinted, in the opinion, Stubley v. Lond. and N. W. R. Wilcox v. Rome, W. & O. R. R., also cited in the opinion, is reported in 39 N. Y. R., 358.—[*Rep.*]

The discrepancy, however, in all these cases, is more in words than in reality. In some of the cases, it is said, the railroad company is bound to exercise the highest degree of care and prudence; while, in other cases, it is said, ordinary care is all that is required. A careful attention to the cases themselves will show, that there is no conflict in principle between them. It is held, in the case of *Kelsey and others* v. *Barney and others* (2 Kern. R., 425), that the law requires every person traveling upon a highway, or navigable public waters, to exercise ordinary care to avoid doing injury to others. This was the case of a collision between two vessels, in entering the harbor of Cleveland; but the rule, whether the highway be upon the water or the land, is the same. There are many cases affirming the same rule, where each of the parties have an equal right to use the highway. While, in the case of *Cook* v. *The New York Central Railroad Company* (3 Trans. Appeal Cases, 8), it is said by the chief judge of this court, in delivering the opinion of the court, that the rule is quite well settled, that, in the management of their road and machinery, a railroad corporation is bound to use the utmost care and vigilance to avoid the dangers attending a collision. Applied to the case then before the court, the rule laid down by the chief judge was strictly correct. The injury in that case was to a traveler, at a street crossing, in the city of Buffalo. If we only bear in mind that negligence is the absence of care, according to circumstances, no fault can be found with the language of the judge in this, or of the opinions of other judges, in similar cases. It is only an application of an elementary rule of law, that great danger demands higher vigilance and more efficient means to secure safety. In the case of a railroad train, crossing the street of a populous city, where persons and vehicles are constantly passing the street, the well settled rule demands higher vigilance and increased caution, on the part of those who control the moving train, than is required in crossing a highway in the country, where a traveler is seldom encountered. So too, when a vessel enters a harbor in a dark night, where vessels are constantly

coming and going, the very highest degree of vigilance and care is required to avoid a collision; and yet the rule of ordinary care is the rule governing such a case. This only shows, that the degree of vigilance and care, which the law exacts, as implied by the requirement of ordinary care, must vary with the probable consequences of negligence. Under some circumstances, a very high degree of vigilance and caution is demanded by the requirement of ordinary care. When the consequences of negligence will probably be serious injury to others, and when the means of avoiding the infliction of injury upon others are completely in the party's power, ordinary care requires, in many cases, almost the utmost degree of human vigilance and caution. (*Kelsey* v. *Barney*, 2 Kern R., 425; *Johnson* v. *The Hudson River Railroad Company*, 6 Duer, 633.) Judge SLOSSON, of the Superior Court, has well stated this rule, in the latter case. He says, the company is bound to use a degree of care and vigilance, in respect to the means whereby accidents or injury to others, using the same thoroughfare in common with themselves, may be avoided, which is proportioned to the dangerous character of its business, or of the mode and means of conducting the same, while the foot passenger is bound to that degree of caution, which persons, thus exposed on a common thoroughfare ought, in common prudence, to exercise. This prudence may, in both, be called ordinary, in the degree. This is but an acknowledgment of the familiar rule, that, in proportion to the danger, will arise the degree of vigilance and caution which a person must use.

The captain of a vessel, who enters a harbor in a dark night, where vessels may be expected to be passing and repassing, puts up his lights, stations his most vigilant watchman at the bow, and, both he and his crew, are all awake to the dangers and perils of his situation. You ask him why all this bustle and precaution, and he will tell you, we are entering the harbor, and common prudence requires it to avoid doing injury to others and running into danger ourselves; and yet, as to the rules of liability for injury to

others, he is only responsible for injuries resulting from ordinary neglect. There is no inconsistency in terms here, in saying the law exacts the very greatest caution and vigilance under such circumstances, and yet only holds the party responsible for ordinary care. We have only to pay attention to the very definition of ordinary care, found in the elementary books, to make this matter clear from the imputation of inconsistency.

Ordinary diligence is the exercise of that care, which every person of common prudence bestows upon his own affairs or concerns. Now the man of common prudence bestows the very highest degree of vigilance and care upon his own affairs, when danger environs him and he apprehends impending disaster. And why? Because common prudence requires it. The man of common prudence acts precisely the same, when engaged in any employment eminently dangerous to others; and ordinary care and common prudence require that he should. The rule undoubtedly is, so far as street crossings in cities are concerned, whatever may be said of the rule in other cases, that the utmost care and vigilance to avoid collision and injury to others must be exercised in running the cars across such street crossings. The corporation cannot claim exemption from liability, simply by complying with the statute requirement. These requirements of the statute, as to the ringing of the bell and blowing the whistle, do not take away or in any manner lessen the common law duties. They must still use reasonable care and diligence, in other respects, when running trains over crossings, if the circumstances of the case render the use of other precautions reasonable. This very question was well considered by Chief Justice SHAW, in the case of *Bradley* v. *The Boston and Maine R. R. Co.* (2 Cush. R., 540), and so decided in that case.

This court expressly held the same, in the case of *Brown* v. *The New York Central Railroad Company* (34 N. Y. R., 404) If other precautions are reasonably required, under particular circumstances, they must be observed, or the rail-

road will be held liable for injuries, which result from their non-observance. The circumstances of danger may be so great, that a flagman, or watch at the crossing, will alone excuse them. This was held in *Bilbee* v. *The London, Brighton, and South Coast Railway Company* (18 Com. Bench. R. N. S., 583); *Stapley and others* v. *The same company* (Law. Rep., 1 Exch., 21, 1865 and 1866). This duty has been assumed, in many instances, at the street crossings in cities, and has, I think, been quite extensively observed by these corporations at crossings, when there was reasonable apprehensions of danger of collisions from the constant passing and repassing of those using the street. The point is made in this case, and there is certainly force in this argument, that conceding that additional precautions, beyond those imposed by statute, on account of special dangers in certain cases, are required by those corporations at the street crossings, yet the right to select and determine what those precautions shall be, belongs to the corporations, and that courts have no right to prescribe what these precautions shall be. If this point had been distinctly raised upon the trial of this case, the question perhaps might be a troublesome one in the case, although I doubt whether it would be tenable then. No such question seems, however, to have been presented to the mind of the judge upon the trial. This idea of placing flagmen at these dangerous crossings, in populous towns, is neither an invention or prescription of the courts. It had its origin with the railroads themselves, and was adopted, I presume, because they regarded it as the safest and best precautionary measure; and it has been so long in use, by the railroads themselves, that courts have assumed and treated the flagman, in many cases, as the safest and best means to be employed, where additional precautions, beyond those imposed by statute, are reasonably required by reason of the increased danger, in certain cases. These defendants had, before this occurrence, regarded it as their duty to place a flagman at this very crossing; but they had withdrawn him some time before this injury was inflicted

upon the plaintiff; and the absence of the flagman, at the
time of this occurrence, is spoken of in the opinions of both
of the judges, who delivered opinions in this very case, setting
aside the nonsuit granted on the first trial of the cause; and
they place the omission to have a flagman at this street cross-
ing, among the circumstances constituting negligence on the
part of the defendants.   The omission of the flagman, at the
crossing, is commented on, as one of the *indicia* of the defend-
ants' negligence, in the case of *Ernst* v. *The Hudson River
Railroad Company* (35 N. Y. R., 28).   In the case of *Wilds*
v. *The Hudson River Railroad Company* (29 N. Y. R., 315,
325), Judge DENIO said: "I will assume, that it was the duty
of the defendants to place a person at the point of intersec-
tion, to warn persons against crossing, when trains were
approaching."   This was done, and the flagman did his duty,
&c.   (See 33 Barb. R., 503.)   In the case of *Cook* v. *These
same defendants*, the omission to have the flagman stationed
at the crossing, was commented upon, and made a point upon
the defendants' negligence, in the opinion of the chief judge;
and his opinion was adopted by the court, while Judge GRO-
VER's opinion, which contained the very same argument that
is presented in his opinion in this case, was not sustained.
In the case at bar, the defendants' counsel requested the court
to charge the jury, that the absence of a flagman at this point,
is *no evidence of negligence on the part of the defendants*,
and excepted to the refusal of the judge so to charge.   The
defendants' counsel excepted to that portion of the charge, in
which the court instructed the jury that, if they think, under
the circumstances, a flagman was called for by ordinary pru-
dence at that point, the omission to supply one was negli-
gence.   It will be seen that the judge refused to charge
absolutely, that the absence of a flagman was no evidence of
negligence, but did charge them that, if they thought, under
the circumstances, a flagman was called for by ordinary pru-
dence at that point, the omission to supply one was negli-
gence.   Here was no ground of exception stated, nor was
the attention of the judge called to the matter now urged,

that it belonged to the defendants to choose their own means of precaution, if additional precautions were required.

The probability is, the suggestion never occured to the counsel or the court upon the trial. But was the submission of this question, in the form in which the judge submitted it, error? The substance of the charge is, that if a flagman was called for by ordinary prudence at that point, the omission to supply one was negligence. This charge, it seems to me, is not objectionable. In the first place, we cannot shut our eyes to the many reported cases in this State, where, at these street crossings in cities, the flagman has been an element in the case. We may take judicial notice, I think, of what every one, who travels upon the railroads, cannot but see and know, unless he shuts his eyes, that it is a very common thing for these corporations, to station flagmen at dangerous crossings in cities and large towns, where many people are expected to be crossing the railroad in the use of the street, both with vehicles and on foot.

This has been employed by the defendants themselves to such an extent, that they have given the courts a very strong inclination that, when precautions additional to those imposed by the statutes are required, the flagman is the most judicious means that can be employed. The courts, as I have before said, have not presumed to be wiser than railroad men, as to the precautionary measures, which it is expedient to employ, under circumstances like those presented in this and similar cases. They have but acted upon the suggestions of the managers of these railroads themselves, in assuming that a flagman was a proper and wise selection out of all the precautionary measures, that could be suggested to supply the demand for additional precautions, in cases where they are required. The right of the court to select any prudent measure of precaution and submit the question to the jury, whether it was not called for by the particular circumstances of the case, can hardly be regarded an open question in this court. In the case of *Johnson* v. *The Hudson River Railroad Company* (6 Duer R., 636), it appears that Judge DUER,

after stating to the jury the measure of diligence and care, which a railroad company was bound to exercise, while using the street, which the public also had a right to use, charged the jury that, if the use of bells and lights was a measure that the prudence and foresight, which they were bound to exercise, ought to have suggested, and if, by such use, disastrous accidents would probably be avoided, the omission to use them, if proved to the satisfaction of the jury, *was culpable negligence;* and it was for the jury to say, whether, to this culpable negligence, the fatal accident that had given rise to the action, might not justly be imputed, and he submitted both questions to the jury, who found a verdict for the plaintiff for $4,000, and this charge was sustained in the General Term, and by this court, on appeal. (6 Duer R., 633, and see pages 643, 644), where this objection is well answered. The judgment of the Superior Court was affirmed, and Judge DENIO, in delivering the opinion of the court, holds that no error was committed in leaving the question to the jury, or in the manner in which it was submitted. (20 N. Y. R., 65.) There is no law imposing the specific duty to place bells on the horses and lights upon the cars in a dark night, and yet the court held, in that case, they must be supplied, if common prudence required it. I entertain no doubt therefore that, if common prudence requires a flagman to be placed at such a street crossing, as the one where this injury was inflicted, the requirement must be complied with. The place, where this accident occurred, was one of great danger, as the evidence in this case shows, while the company kept these two trains of empty box cars standing upon the two first tracks. They undoubtedly · had the right to leave these cars standing upon their track as long as they pleased, but, if the danger to those using the streets is thereby increased, they must employ all reasonable additional precautions to render the crossing safe, so far as the highest degree of caution and foresight may suggest, and are guilty of culpable negligence, if they do not. (6 Duer. R., 633; 20 N. Y. R., 66; *McKay·*

v. *The New York Central Railroad Company*, 35 N. Y. Reports, 75.)   This latter case holds that, where the railroad company had obstructed the view, in the approach to their road, by the piling of wood, so that an approaching train could not be seen by the traveler, until he is upon the track, that such traveler will not be deemed guilty of negligence in not stopping his team, and ascertaining whether a train might not be approaching.

This case seems to me to have been essentially disposed of, when it was before this court, on a former occasion.   The case was held to be one for the jury, and as it was properly submitted, the judgment should be affirmed.   (34 N. Y. R., 622.)

MURRAY and DANIELS, JJ., were for reversal on the ground stated in the opinion of GROVER, J.

WOODRUFF, for reversal on the grounds stated in his opinion in the Grippen case *infra*.

HUNT, Ch. J., and MASON, J., were for affirmance; LOTT, J., not voting.

Judgment reversed and new trial ordered.